## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Marydith J. Newman, after being duly sworn, do depose and state:

### I.  INTRODUCTION

1.     I am a Postal Inspector of the United States Postal Inspection Service (USPIS) assigned to the Washington Division, Merrifield, Virginia domicile.  I have been employed by the USPIS since October 2003.  I have received training in general law enforcement and conducting criminal financial investigations, and I have participated in criminal investigations to include violations related to Mail Fraud, Wire Fraud and Identity Theft.  I am currently assigned to the Postal Inspection Service's Mail Fraud Team which has investigative responsibility over crimes affecting the integrity of the U.S. Mail and related crimes in, among other jurisdictions, the Washington D.C. Metropolitan area.

2.     The facts and information contained in this affidavit are based on my personal knowledge and observations, my review of records and documents obtained during this investigation, information received from other individuals, including cooperating witnesses, employees of the Securities and Exchange Commission's Division of Enforcement ("SEC Division of Enforcement"), and other law enforcement officers, and information gained through my training and experience.  This affidavit does not set forth all information known to the Postal Inspection Service about this case and is being submitted solely for the purpose of providing sufficient information to establish probable cause for the search of the two CD-ROM disks bates labeled 2-TBC-00256 and KC-TBC-00001, respectively (as more fully described in Attachment A), which the Telephone Broadcast Company produced to the Securities and Exchange Commission ("SEC") in response to an SEC investigative subpoena and simultaneously voluntarily produced to the U.S. Attorney's Office.

3.      This affidavit contains information necessary to support an application for a search warrant to search all data, files and information contained on the CD-ROM disks bates labeled 2-TBC-00256 and KC-TBC-00001, respectively (as more fully described in Attachment A).

4.      Based upon the investigation described below, I submit that the facts set forth in this affidavit establish that there is probable cause to believe that evidence, contraband, fruits and instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud); 1341 (mail fraud) and 15 U.S.C. §§ 78j(b) (securities fraud) and 78ff (penalties for criminal securities fraud) are presently located within the CD-ROM disks bates labeled 2-TBC-00256 and KC-TBC-00001, respectively (as more fully described in Attachment A).

## STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

### Background of Voice Mail Stock Manipulation Scheme

5.      On or about August 19, 2004, the Securities and Exchange Commission announced in a news release that it had issued an investor alert designed to warn Americans of a new scam sweeping the country:  answering machine wrong number stock touts.  The SEC News Release warned that, "voice mail messages are appearing on home answering machines from coast to coast saying that the stock price of certain small, thinly traded companies will soon shoot up."  According to the SEC Release, "the breezy, intimate messages sound as if a female caller mistakenly believes she has dialed a girlfriend and is confiding inside information she has learned from "that hot stock exchange guy I'm dating."  The SEC Release further advised that, "Regulators believe these voicemails are part of a `pump and dump' stock manipulation scheme, whereby the people behind the messages intend to profit by driving up the price of their targeted

2

stocks, then selling, and leaving victims with losses." The SEC Release disclosed that the SEC

had received hundreds of complaints, and encouraged investors who had received these types of

calls to contact the SEC to provide additional information about the messages received.

      6.    During the course of this investigation, I spoke to a Staff Attorney at the United

States Securities and Exchange Commission's Division of Enforcement who informed me that

the SEC had received more than 1,000 complaints from members of the public concerning

purportedly misdirected voicemail or answering machine messages offering a stock tips as

described in the SEC's News Release and Investor Alert. The Staff Attorney informed me that

many of these complaints related to voicemails which touted the securities of the following

companies which were publicly traded during the time period of in or about July and/or August

2004: American Multiplexer Corp. ("AMUT"), Donini, Inc. ("DNNI"), 5G Wireless

Communications, Inc. ("FGWC"), Innovative Food Holdings, Inc. ("IVFH"), Maui General

Store, Inc. ("MAUG"), Power3 Medical Products, Inc. ("PWRM"), and Twister Networks, Inc.

("TWTN").

      7.    The SEC Staff Attorney further informed me that the SEC had obtained copies of

messages from several of the complainants which touted the following companies: PWRM,

FGWC, IVFH and MAUG. In one of the voice mail messages touting PWRM, a woman named

"Wendy" attempts to pass a "hot stock tip" to a close friend but leaves the message on the voice

mail of the targeted investors thereby giving the recipient the impression that s/he was receiving

the "stock tip" by mistake or accident. Wendy tells her friend that she has learned from a "stock

exchange guy" that PWRM will "open cheap" at about $2.50, but will "take off" after the

weekend following the company's announcement that it has obtained a patent on a "zillion dollar

cancer test thing." The contents of the voice mail message are as follows:

> Hey Steph, it's Wendy. I looked for your old number and I couldn't find it but Brady says this is your new one. I hope it's the right one. Anyway, remember Evan, that hot stock exchange guy I'm dating--he gave my dad that hot stock tip in June on SMSI and it went from a buck to like five bucks in two weeks and you were mad because I didn't call you? Well, I'm calling you now. There's this new company that supposedly developed some zillion dollar cancer test thing and it's going to go up big this week—some patent thing, whatever that is. Anyway, the stock symbol is P-W-R-M, and he says it's gonna open cheap, like $2.50—I'm sorry, I'm eating 'cause I'm starving—it's $2.50 now and it's going to take off after this weekend so get as much as you can. Call me on my cell phone, okay; I'm still in New York. Um, my dad and I are going to be buying a bunch tomorrow and the only people I told is Sam and Ellen--it's kind of a secret. Okay, so give me a call or e-mail me. I love you. Bye.

8.    According to a Staff Attorney at the SEC, it appears from the complaints the SEC Division of Enforcement received that messages like the one above touting the stock of PWRM were distributed during the period from on or about August 9, 2004, through on or about August 18, 2004. The SEC Staff Attorney informed me that the Division of Enforcement had received more than 800 complaints from people who had received similar pre-recorded messages on their voice mail/answering machines relating to PWRM. Almost all of the complaints received by the SEC were from individuals who reported receiving phone calls during the period from on or about August 11, 2004, through on or about August 18, 2004. These messages were all unsolicited and appeared to have been left by persons unknown to the voice mail/answering machine owners.

9.    My review of price/volume information for PWRM stock during the period from August 11, 2004, through August 18, 2004, revealed that the voice mail messages may have sparked considerable public interest in PWRM. Despite the fact that

there were no publicly disseminated news announcements issued by the company around or during this time period, except for the routine filing of PWRM's Form 10Q periodic report, the price and volume of PWRM shares traded increased significantly between August 11, 2004, and August 18, 2004.

10.     For example, an internet trading database reveals that on Wednesday, August 11, 2004, the volume of PWRM shares traded was approximately 379,900 shares. According to the database, the stock lost money that day, opening at a price of $2.20 per share, and closing down $.03 cents at $2.17. The following day, August 12, 2004, the volume of trades in the shares of PWRM increased dramatically from 379,900 to 2,346,900. Moreover, the stock price, which opened at $2.27, gained $.58 cents before closing at $2.85 per share.

11.     Heavy trading in PWRM continued on Friday, August 13, 2004, and into the following trading week. More than 2,000,000 shares of PWRM were traded on August 13, 2004, and on Monday, August 16, 2004. In addition, the price per share of PWRM also continued to rise. On August 13, 2004, the stock closed at a price of $3.08. Thereafter, on August 16, 2004, the stock price increased by an additional twenty-five cents, closing at $3.33 per share.

12.     Trading activity in PWRM peaked on Tuesday, August 17, 2004. The volume of shares traded that day jumped to 5,695,200, more than double the number of shares traded the previous day. In addition, the stock price reached a high of $4.88 before closing at $4.38 per share, a gain of more than $1 from the closing price on August 16.

5

13.    The volume of shares traded in PWRM remained high on Wednesday, August 18, 2004. In all, there were 2,925,500 shares traded that day. However, the closing price of the stock fell to $3.47, suggesting heavy sales of the stock. Thereafter, both the price of shares and the trading volume of PWRM rapidly declined. By Friday, August 20, 2004, trading volume fell to 1,108,400 shares, and the stock price closed at $2.62. By Monday, August 23, 2004, volume fell sharply to 572,400 shares, and the stock price closed at $2.52.

14.    An SEC staff attorney informed me that his review of trading records revealed that account holders with Sunstate Equity Trading, Inc. ("Sunstate"), a broker-dealer registered with the SEC, accounted for about thirty-three percent of the retail sales of PWRM for the time period between August 11, 2004, and August 18, 2004. These account holders included Trendline, Inc. ("Trendline"); Arborcrest Assets, LP ("Arborcrest"), and South Shore Harbor Group, LP ("South Shore").

15.    The voicemail messages touting MAUG, IVFH, and FGWC were very similar to those which touted PWRM. As with PWRM, in each of the voice mail messages obtained by the SEC relating to MAUG, IVFH and FGWC, a woman purportedly attempts to pass a stock tip to a close friend, but "mistakenly" leaves the message on the voice mail of targeted prospective investors. In two of the voice mail messages (concerning MAUG and IVFH), the woman instructs her friend to purchase stock in advance of a "big announcement" destined to increase the stock price. In another voice mail message, the woman tells her friend that the stock price of FGWC will rise from $.10 cents to a "buck or so" following an impending "deal" by the company.

6

**Evidence of Probable Cause That CD-ROMs Contain Evidence and Fruits and**

**Instrumentalities of Criminal Activity**

16.     During the investigation, telephone billing records were used to determine

the origin of the prerecorded voicemail touting the stock of PWRM that was left on the

voicemail system of one of the people who had complained to the SEC about the

fraudulent voicemails.  These telephone billing records demonstrated that the prerecorded

voicemail was distributed from the Telephone Broadcast Company, LLC.  Telephone

Broadcast Company, LLC and it's affiliate Telephony Leasing Corporation)(collectively

"TBC") are privately held companies incorporated under the laws of Georgia with their

principal place of business located in Augusta, Georgia.  TBC was in the business of

broadcasting recorded telemarketing messages over the interstate telephone lines to

millions of households for its clients.

17.     During the investigation I interviewed several TBC employees and

Michael O'Grady, one of the owners of TBC in August 2004.  From these interviews, I

learned that clients of TBC ordinarily utilized a toll free number to contact TBC to leave

or "drop" pre-recorded messages on TBC's one box system for distribution to telephone

subscribers throughout the United States.  TBC distributed the recorded messages by

making automated calls to telephone subscribers who were identified either on lists that

TBC's clients provided to TBC or on lists that TBC supplied.  The one box system

automatically kept a record of the phone number from which any pre-recorded message

was loaded onto the system, and sent an automated e-mail to a TBC technician when a

pre-recorded message was loaded onto the system.  This automated e-mail reflected the

7

telephone number that was used to load the voice message on the system. After receiving

the automated e-mail, the TBC technician ordinarily completed a new order form

detailing the parameters of the telemarketing campaign. Thereafter, the TBC technician

would activate TBC computers to run the telemarketing campaign.

18.    In running the campaign, TBC computers would make automated calls to

designated telephone numbers throughout the United States and play the prerecorded

message when the calls were answered. Ordinarily, TBC's computer network was

configured to provide all TBC employees with access to live reporting results for each

telemarketing campaign which assisted TBC employees in monitoring the campaigns and

billing clients for the campaigns. In addition, once the recorded message broadcast

campaign was run, TBC servers ordinarily retained electronic data which reflected the

telephone numbers that were dialed during the campaign, and the messages that were

distributed.

19.    On May 3, 2005, Michael O'Grady, one of two controlling owners of

Telephone Broadcast Company, LLC, pled guilty to one count of obstruction of justice

for obstructing the SEC's investigation of a nationwide pump and dump securities fraud

scheme which involved the manipulation of the price and volume of several publicly

traded securities through, among other methods, the use of fraudulent voicemails that

were distributed to hundreds of thousands of households throughout the United States.

O'Grady pled guilty to obstructing and impeding the SEC's investigation by causing and

attempting to cause the destruction of TBC's files and records. The scheme the SEC was

investigating is the same scheme that is the subject of the criminal investigation for which

8

this search warrant is being sought. Attached hereto as Exhibit C is the Statement of Offense filed in United States v. Michael O'Grady, 05-119. The following information is a summary of some of the information contained in this statement of offense.

20. According to Michael O'Grady, in or about July 2004, Roderick Bolling contacted him about having TBC assist him in doing a voicemail telemarketing campaign for a stock promoter that O'Grady later learned was Jeffrey Mills. Bolling gave O'Grady a series of special instructions for doing this campaign including the instruction that the pre-recorded message should only be played if an answering machine or voicemail system answered the call, and that no telephone number should be dialed twice during the campaign. O'Grady agreed that TBC would do the telemarketing campaign.

21. Bolling contacted O'Grady on several occasions during the period of late July and in August 2004 to inform O'Grady that a message had been dropped onto TBC's system for distribution in the voicemail telemarketing campaign discussed above. Bolling typically informed O'Grady of the stock symbol for the stock that the voicemail campaign would promote, and recommended that O'Grady purchase shares of the stock that was being promoted. For example, when Bolling spoke to O'Grady about the first voicemail which promoted MAUG, he advised O'Grady that the voicemail campaign would be combined with an e-mail and mail campaign, and further advised O'Grady to buy MAUG stock and wait for the promotion to kick in. Bolling called O'Grady concerning voicemails dropped onto TBC's system which involved the following stocks, among others: MAUG, IVFH, FGWC, PWRM, and DNNI.

22.     On August 17, 2004, O'Grady and his business partner at TBC listened for the first time to one of the prerecorded stock promotion messages Bolling had caused to be dropped on the TBC system for distribution. In the voicemail to which O'Grady listened, a woman purportedly attempts to pass a stock tip to a close friend for whom she hopes she has the right telephone number. Shortly after listening to the voicemail message, on or about August 18, 2004, O'Grady informed Bolling that TBC would not distribute any additional messages for Bolling for this campaign, and O'Grady refused to distribute two new messages that had been dropped on the TBC system. Bolling asked O'Grady to delete all the messages from the campaign, and all messages from previous campaigns that one of Bolling's companies, Direct Activation, had done in the past. O'Grady instructed a TBC engineer to delete the messages relating to the Bolling campaign off the TBC system. After receiving O'Grady's instructions, the TBC engineer deleted the messages relating to Bolling from the TBC computer system. Unbeknownst to O'Grady, Bolling, and others, at least one TBC employee, Kathryn Corns, maintained files and records relating to Bolling's voicemail campaign on her laptop. These files include .wav files and the .dcl file.

23.     On August 18, 2004, Bolling contacted O'Grady again and persuaded him to have TBC distribute additional stock promotion messages for Bolling. Bolling caused messages to be dropped onto the TBC system which touted the stock of AMUT and TWTN, and these messages were distributed to telephone subscribers. On August 19, 2004, Bolling contacted O'Grady by telephone and requested that O'Grady delete everything related to Bolling, including messages relating to the stock promotion

10

campaign and campaigns for Direct Activation, off TBC's system. O'Grady instructed a

TBC engineer to delete everything off TBC's system relating to Bolling's voicemail

campaign including messages, the Bolling campaign file, and call data information. Files

and call data were deleted off of the TBC computer systems. However, one employee,

Kathyrn Corns, maintained records and files relating to the Bolling campaign on her

laptop computer.

      24.    During the investigation, I interviewed an engineer who worked at TBC,

who informed me that sometime after the deletion of files relating to the Bolling

voicemail campaign, he attempted to undelete files and records that had been deleted, and

was successful in recovering some of the deleted files.

      25.    On October 28, 2004, in response to an SEC investigative subpoena, TBC

provided the SEC with two CD-ROM disks bates labeled 2-TBC-00256 and KC-TBC-

00001. According to the cover letter addressed to the SEC, 2-TBC-00256 contained e-

mails with attachments from TBC, and KC-TBC-00001 contained the files that remained

on Kathryn Corn's laptop computer including various .wav files and the .dcl file. TBC

obviously included on these disks documents and records it determined to be responsive

to the SEC's subpoena which was issued in the SEC civil investigation of the scheme that

is also the subject of the instant criminal investigation. TBC forwarded a copy of the two

CD-ROMs it provided to the SEC (2-TBC-00256 and KC-TBC-00001) to the United

States Attorney's Office for the District of Columbia. These two CD-ROM disks have

not been reviewed by anyone from the U.S. Attorney's Office or the Postal Inspection

Service.

26.    Based on the foregoing information and upon my knowledge, training and experience in the investigation of wire fraud, mail fraud,  and other postal violations, your affiant believes that fruits and evidence of the commission of a criminal offense, as described below in Attachment B, will be found in the two CD-ROM disks bates labeled 2-TBC-00256 and KC-TBC-00001 which are described below in Attachment A, and therefore, a search warrant should be issued.

WHEREFORE, your affiant believes based on the information provided that probable cause exists for search, and seizure warrants to be issued for the above identified and described location and assets, for evidence of violations of 18 U.S.C. §§ 1343 (wire fraud); 1341 (mail fraud) and 15 U.S.C. §§ 78j(b) (securities fraud) and 78ff (penalties for criminal securities fraud).

The statements above are true and accurate to the best of my knowledge and belief.


_____
Marydith Newman,
United States Postal Inspector


Sworn to before me this _____ day of January 2006.


_____
United States Magistrate Judge
District of Columbia

## ATTACHMENT A

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

### 2 CD-ROM Disks Bates Labeled  2-TBC-00256 and KC-TBC-00001,

### respectively,

CD-ROM disk bates labeled 2-TBC-00256 is a Memorex Pocket CD-R that on the label side of the disk has in blue lettering the words Memorex at the top, and which appears to have an imprinted number of L113G4105121722A09 on the label side of the disk.  The CD-ROM disk is bates labeled 2-TBC-00256, and is currently located within the District of Columbia at 555 4th Street, NW, Washington, D.C., Room 5241..

CD-ROM disk bates labeled KC-TBC-00001 is a compact disk recordable that on the label side of the disk is white with the bates label KC-TBC-00001 in black typeset, and which appears to have an imprinted number of 4120A2722 14686 03 on the label side of the disk.  CD-ROM disk bates labeled KC-TBC-00001 is currently located within the District of Columbia at 555 4th Street, NW, Washington, D.C., Room 5241.

## ATTACHMENT B

<u>DESCRIPTION OF ITEMS TO BE SEIZED</u>

All electronic files, documents, records, opened e-mails, attachments to opened e-mails, .wav files, .dcl files, and spreadsheets contained on the CD-ROM disks bates labeled 2-TBC-00256 and KC-TBC-00001 (as more fully described in Attachment A).

**Attachment C**

FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAY 0 3 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. `C 5 · 11 9` |
| | : | |
| v. | : | |
| | : | VIOLATION: 18 U.S.C. § 1512(c)(1) and |
| MICHAEL O'GRADY | : | (c)(2)  (Obstruction of Justice) |
| Defendant. | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the defendant MICHAEL O'GRADY  agrees and stipulates as follows:

At all times relevant to the information filed in this criminal action:

### I.    Introduction

In August 2004, defendant Michael O'Grady willfully, knowingly and corruptly obstructed and impeded the Securities and Exchange Commission's investigation of a nationwide pump and dump securities fraud scheme which involved the manipulation of the price and volume of several publicly traded securities through, among other methods, the use of fraudulent voicemails that were distributed to hundreds of thousands of households throughout the United States.

### II.    Relevant persons and entities

Defendant MICHAEL O'GRADY was the President and one of two controlling owners of Telephone Broadcast Company, LLC.

Telephone Broadcast Company, LLC, and its affiliate Telephony Leasing Corporation LLC, were privately held companies incorporated under the laws of the State of Georgia with

their principal place of business located in Augusta, Georgia (collectively "TBC"). TBC was in the business of broadcasting recorded telemarketing messages over the interstate telephone lines to millions of households for its clients. TBC was paid by clients to make automated calls to telephone numbers throughout the United States and to play prerecorded messages when the telephone calls were answered by individuals, answering machines or voicemail systems.

Promoter #1 was a resident of Altamonte Springs, Florida, whose company, which is hereinafter referred to as Company A, had been a customer of TBC.

American Multiplexer Corp. ("AMUT") was a data distribution and compression provider incorporated under the laws of the State of North Carolina with its principal place of business in Sunnyvale, California. AMUT's common stock was quoted in the Pink Sheets, a price quotation system primarily used for the trading of the securities of small corporations that do not meet the minimum listing requirements of a national securities exchange. AMUT was quoted under the stock symbol AMUT until December 20, 2004, when the SEC revoked the registration of AMUT's securities pursuant to Section 12(j) of the Securities Exchange Act of 1934.

Donini, Inc. ("DNNI") was a pizzeria franchise management company incorporated under the laws of the State of New Jersey with its principal place of business in Montreal, Canada. DNNI's common stock was quoted under the symbol DNNI on the OTC Bulletin Board, an electronic price quotation system primarily used for the trading of the securities of over-the-counter securities corporations that do not meet the listing requirements of a national securities exchange.

5G Wireless Communications, Inc. ("FGWC") was a wireless broadband retailer

2

incorporated under the laws of the State of Nevada with its principal place of business in Marina Del Ray, California. FGWC's common stock was quoted under the symbol FGWC on the OTC Bulletin Board.

Innovative Food Holdings, Inc. ("IVFH") was a restaurant supply distributor incorporated under the laws of the State of Florida with its principal place of business in Naples, Florida. IVFH's commons stock was quoted under the symbol IVFH in the pink sheets.

Maui General Store, Inc. ("MAUG") was an internet and mail order catalog retailer incorporated under the laws of the State of New York with its principal place of business in Hana, Hawaii. MAUG's common stock was quoted under the symbol "MAUG" on the OTC Bulletin Board.

Power3 Medical Products, Inc., ("PWRM") was a specialty healthcare and biotechnology holding company incorporated under the laws of the State of New York with its principal place of business in the Woodlands, Texas. PWRM's securities were registered with the Securities and Exchange Commission, and were quoted under the symbol PWRM on the OTC Bulletin Board.

Twister Networks, Inc. ("TWTN") was a Voiceover Internet Protocol communications company incorporated under the laws of the State of Nevada with its principal place of business in Los Angeles, California. TWTN's commons stock was quoted under the symbol TWTN in the Pink Sheets.

## III.     Background information on TBC's operations and records

Clients of TBC utilized a 1-800 telephone number to contact TBC to leave or "drop" pre-recorded messages on TBC's one box system for distribution to telephone subscribers throughout the United States that were identified on lists clients either provided to or received from TBC.

The one box system automatically kept a record of the phone number from which any pre-recorded message was loaded onto the system, and sent an automated e-mail to a TBC technician when a pre-recorded message was loaded onto the system. This automated email reflected the telephone number that was used to load the voice message on the system. After receiving the automated email, the TBC technician ordinarily completed a new order form detailing the parameters of the telemarketing campaign.

Thereafter, a TBC technician would activate TBC computers to run the telemarketing campaign. The TBC computers would make automated calls to designated telephone numbers throughout the United States and play the prerecorded message when the calls were answered. Ordinarily, the TBC's computer network was configured to provide all TBC employees with access to live reporting results for each telemarketing campaign which assisted TBC employees in monitoring the campaigns and billing clients for the campaigns. In addition, once the recorded message broadcast campaign was run, TBC servers ordinarily retained electronic data which reflected the telephone numbers that were dialed during the campaign, and the messages that were distributed. Certain TBC clients were typically billed a multiple of the telephone bill for each pre-recorded message telemarketing campaign.

## IV.    The fraudulent voicemail stock promotion campaign and obstruction of justice.

By the end of May 2004, Company A owed TBC a substantial amount of money for prior pre-recorded message telemarketing campaigns which were not related to stock promotions. In June or July 2004, Promoter #1 approached O'Grady about having another Promoter #1 company, (hereinafter referenced as "Company B"), use TBC's computer systems to do pre-recorded message telemarketing campaigns. Promoter #1 represented to O'Grady that these

4

telemarketing campaigns, in addition to providing TBC with more business, would allow Promoter #1 to pay off Company A's debt to TBC. In or about June 2004, Company B executed an agreement with TBC.

In July 2004, Promoter #1 contacted O'Grady about a voicemail message telemarketing campaign for a stock promoter O'Grady later learned was Promoter #2 Through numerous interstate telephone calls, Promoter #1 gave O'Grady special instructions with regard to this stock promotion campaign. Promoter #1 instructed O'Grady to keep knowledge of the campaign by TBC employees to a minimum. Promoter #1 wanted all orders for the campaign to be done over the telephone and did not want e-mails or written reports to be utilized. Promoter #1 promised to pay for the telemarketing campaign completely in cash. In addition, Promoter #1 instructed O'Grady that he wanted the campaign structured so that the pre-recorded message would only be played if an answering machine or a voicemail system answered the call. Promoter #1 also instructed O'Grady to structure the campaign so that no telephone number would be dialed twice during the telemarketing campaign. Promoter #1 told O'Grady that no calls should be made to the state of Florida where he lived. TBC agreed to do the voicemail message telemarketing campaign for Promoter #1 and Company B.

Thereafter, O'Grady contacted a TBC Engineer and explained to him the parameters of the Promoter #1 campaign. O'Grady informed him that there were to be no new order forms for the campaign, and that the TBC engineer was to take direction from O'Grady. O'Grady told the TBC engineer that Promoter #1 wanted as few TBC people as possible involved in the telemarketing campaign. In later conversations, O'Grady repeatedly referred to the campaign as "Covert Ops." O'Grady cautioned the TBC engineer not to discuss the campaign with other

employees.  The TBC engineer, however, did not follow all of O'Grady's instructions.

A TBC employee set up a new account for the voicemail message telemarketing campaign Promoter #1 had requested, and initially listed Promoter #1 as placing the new order and listed Promoter #1 as the contact name for the campaign.  Computer files relating to the campaign were kept in an electronic folder which included the words "[nickname for Promoter #1]_hush."  TBC employees who knew about the telemarketing campaign frequently referred to it as the "[initials for Promoter #1] Campaign."  At one point, O'Grady requested that the contact name be changed.  When O'Grady found out the contact name had been changed to "Mike O," he instructed that the name be changed again.  By August 2, 2004,  the contact name for the campaign was changed to "XYZ" and the contact number was changed to (999) 999-9999.

On July 28, 2004, Promoter #1 called O'Grady and informed him that a voicemail message had been dropped on TBC's system for a stock that traded under the symbol MAUG.  Promoter #1 informed O'Grady that the pre-recorded message was a stock promotion that would be combined with an e-mail and mail campaign.  Promoter #1 informed O'Grady that MAUG had just signed a marketing agreement with a major manufacturer.  Promoter #1 further advised O'Grady to purchase shares of the  common stock of MAUG, and wait for the promotion to kick in.  Promoter #1 said he would tell O'Grady when to sell the stock.

O'Grady instructed the TBC engineer to run the campaign.  O'Grady then contacted his stock broker and placed an order to purchase 10,000 shares of MAUG common stock.  O'Grady also advised three friends to purchase MAUG stock.  Each of these friends agreed to share 50 percent of their profits with O'Grady, and O'Grady agreed to reimburse them for any losses.

The TBC system distributed the following voicemail message or a substantially similar

message to hundreds of thousands of telephone subscribers throughout the United States:

> Hey Tracy it's Debbie, I tried to find your old number and Tammy said this was your new one, I hope it's the right one. Anyway, remember Evan that hot stock exchange guy I'm dating? He gave my dad that hot tip on WLSF and it went from under a buck to like 3 bucks in two weeks and you were mad I didn't call you. Well, I am calling you now. This new company is supposed to be like the next Tommy Bahama, and they're making some big news announcement this week. The stock symbol is MAUG. He said it's cheap now like 50 cents. . .I'm sorry I am eating and I'm starving. . .It's 50 cents now and it is going up to like 5 or 6 bucks this week, so get as much as you can. Call me on my cell I am still in Orlando (407) XXX-XXXX and dad and I are buying a bunch tomorrow and I already called Kelly and Ron too. Anyways I miss you, give me a call. Bye.

On July 28, 2004, O'Grady purchased 10,000 shares of MAUG common stock at $.68 per share and sold the shares on July 29, 2004, realizing an approximate $3,001 profit (without consideration of commissions).

In or about August 2004, Promoter #1 caused a message, which touted the common stock of IVFH, to be dropped onto TBC's system for distribution in the voicemail telemarketing campaign he had previously arranged with O'Grady. Promoter #1 informed O'Grady that this voicemail campaign would involve IVFH, and advised O'Grady to purchase shares of IVFH common stock. On or about August 5, 2004 and August 10, 2004, O'Grady purchased 30,000 shares of IVFH and 15, 000 shares, respectively. In addition, O'Grady advised three friends to purchase IVFH stock. Each of these friends agreed to share 50 percent of their profits with O'Grady, and O'Grady agreed to reimburse them for any losses.

The TBC system distributed the following voicemail message or a substantially similar message to hundreds of thousands of telephone subscribers throughout the United States:

> Hey Pam, it's Renee. I lost your old number and Tammy said this was your new one–hope it's the right one. Anyway, remember Scott, that hot stock exchange guy I'm dating? And remember when he gave my dad that stock tip in June on SMSI and it went from a buck to like five bucks in two weeks and you were mad

7

> because I didn't call you about it? Well, I'm calling you now. There's this new
> company that just signed a food deal with Emeril, you know, know the TV chef,
> and they're making a big announcement this week. Anyway, the stock symbol is
> IVFH. He said its cheap now, like $.25, but after this weekend it's going to be
> taking off, so get as much as you can. Call me on my cell phone, ok? I'm still in
> Orlando. Its 407-XXX-XXXX. And, uh, my dad and I are gonna be buying a
> bunch and I called Kelly and Ron, too. Anyway, give me a call. I miss you. Bye.

On August 9, 2004, and August 11, 2004, O'Grady sold 30,000 IVFH shares and 10,000 IVFH

shares, respectively, realizing an approximate $3,769.50 profit (without consideration of

commissions).

In or about August 2004, Promoter #1 caused a message, which touted the common stock

of FGWC, to be dropped onto TBC's system for distribution in the voicemail telemarketing

campaign he had previously arranged with O'Grady. Promoter #1 informed O'Grady that this

voicemail campaign would involve FGWC, and advised O'Grady to purchase shares of FGWC

common stock. O'Grady purchased 200,000 shares of FGWC, and advised three friends to

purchase FGWC stock. Each of the friends agreed to share 50 percent of their profits with

O'Grady, and O'Grady agreed to reimburse them for any losses.

Thereafter, the TBC system distributed the following voicemail message or a

substantially similar message to hundreds of thousands of telephone subscribers throughout the

United States:

> Hey Patty, its Lisa, um, I can't find that number you gave me and I asked Jessica and she
> said this was your new one so I hope it's the right one. Anyway, remember Matt, that hot
> stock exchange guy I'm dating, remember when he gave my dad that stock tip in June on
> SMSI and it went from a buck like to five bucks in two weeks. You were mad because I
> didn't call you about it, well, I'm calling you now cause there's this new company, some
> wireless internet provider, whatever that is, and someone may be trying to buy it or sell it;
> it's kind of confusing. But, anyway, its going up big this week–some big internet
> deal–and the stock symbol is F-G-W-C. He said it's open cheap, under 10 cents–sorry,
> I'm eating 'cause I'm starving–anyway, it's under 10 cents now, but it's going up to a

buck or so, so get as much as you can. Give me a call on my cell; I'm still in New York. Uh, my dad and me are going to be buying a bunch, and I only told Sam and Ellen about it, besides you now, because its kind of a secret. Anyway, call me or e-mail me. Love you, bye.

On August 16, 2004, O'Grady sold 200,000 shares of FGWC realizing an approximate $895 profit (without consideration of commissions).

In or about August 2004, Promoter #1 caused a message, which touted the common stock of PWRM, to be dropped onto TBC's system for distribution in the voicemail telemarketing campaign he had previously arranged with O'Grady. Promoter #1 contacted O'Grady and informed O'Grady that this voicemail campaign involved PWRM, and advised O'Grady to purchase shares of PWRM common stock. O'Grady had previously purchased 35,000 shares of PWRM stock at the advice of a friend of Promoter #1. On or about August 10, 2004, O'Grady purchased another 5,000 shares of PWRM stock. In addition, O'Grady advised three friends to purchase PWRM shares with the understanding that he would share in any profits made from these purchase, and O'Grady agreed to reimburse them for any losses.

Thereafter, the TBC system distributed the following voicemail message or a substantially similar message to hundreds of thousands of telephone subscribers throughout the United States:

> Hey Steph, it's Wendy. I looked for your old number and I couldn't find it but Brady says this is your new one. I hope it's the right one. Anyway, remember Evan, that hot stock exchange guy I'm dating--he gave my dad that hot stock tip in June on SMSI and it went from a buck to like five bucks in two weeks and you were mad because I didn't call you? Well, I'm calling you now. There's this new company that supposedly developed some zillion dollar cancer test thing and it's going to go up big this week—some patent thing, whatever that is. Anyway, the stock symbol is P-W-Ř-M, and he says it's gonna open cheap, like $2.50—I'm sorry, I'm eating 'cause I'm starving—it's $2.50 now and it's going to take off after this weekend so get as much as you can. Call me on my cell phone, okay;

I'm still in New York. Um, my dad and I are going to be buying a bunch
tomorrow and the only people I told is Sam and Ellen--it's kind of a secret. Okay,
so give me a call or email me. I love you. Bye.

O'Grady sold 5,000 shares of PWRM on or about August 12, 2004, and sold another 35,000

shares of PWRM on or about August 17, 2004. Without factoring in commissions paid for the

purchases and sales of stock, O'Grady realized a net loss of approximately $39,059 from the sale

of the 35,000 shares of PWRM. If the shares of PWRM purchased in July are not considered in

calculating O'Grady's gain or loss from his investment in PWRM stock, then O'Grady realized a

net profit of approximately $4,124.50 or $7,700 (without consideration of commissions),

depending upon the method of calculation, from his sale of the 5,000 shares of PWRM he

purchased on August 10, 2004.

In or about August 2004, Promoter #1 caused a message, which touted the common stock

of DNNI, to be dropped onto TBC's system for distribution in the voicemail telemarketing

campaign he had previously arranged with O'Grady. Promoter #1 contacted O'Grady and

informed O'Grady that this voicemail campaign involved DNNI, and advised O'Grady to

purchase shares of DNNI common stock. O'Grady did not place an order to purchase DNNI

shares.

Thereafter, the TBC system distributed voicemail messages touting DNNI common stock,

which were similar to the messages described above, to hundreds of thousands of telephone

subscribers throughout the United States.

During the time period TBC distributed voicemail messages for the "covert" Promoter #1

campaign, O'Grady instructed a TBC engineer to alter TBC's computers to prevent the system

from providing live reporting results for the covert campaign to all TBC employees. O'Grady

instructed the TBC engineer to restrict live reporting results for the campaign to the TBC

engineer and O'Grady. These instructions by O'Grady were very unusual.

On or about August 17, 2004, O'Grady and his business partner at TBC listened for the

first time to one of the prerecorded stock promotion messages Promoter #1 had caused to be

dropped on the TBC system for distribution. In addition, an individual informed O'Grady that

there was a lot of chatter on an internet message board about a pump and dump scheme relating

to stock that involved the use of voicemail messages. O'Grady went to the internet site and saw

mention of PWRM in connection with concerns about a pump and dump stock scheme and

voicemails. O'Grady's business partner told O'Grady to stop the campaign.

On or about August 18, 2004, O'Grady instructed a TBC employee to stop running the

voicemail telemarketing campaign for Promoter #1. O'Grady spoke to Promoter #1 in a

telephone call and informed Promoter #1 that the telemarketing campaign had been stopped and

TBC would not distribute any more messages for Promoter #1. Promoter #1 informed O'Grady

that two additional messages for the campaign had been dropped onto the TBC system and

attempted to convince O'Grady to distribute the additional messages. O'Grady refused to

distribute the new messages. Thereafter, Promoter #1 asked O'Grady to delete all the messages

from the campaign and all messages from Company A campaigns.

On or about August 18, 2004, O'Grady contacted a TBC engineer and instructed him to

get the messages relating to the Promoter #1 campaign off the TBC system. O'Grady, in

directing the TBC employee to delete all the messages relating to the Promoter #1 campaign off

the TBC computer system, intended to corruptly obstruct and impede any Securities and

Exchange Commission investigation or any other law enforcement investigation relating to the

11

aforementioned "covert" telemarketing stock promotion campaign.  After receiving O'Grady's instructions, the TBC engineer deleted the messages relating to the Promoter #1 stock promotion campaign from the TBC computer system.  However, unbeknownst to O'Grady, Promoter #1 and others, at least one TBC employee maintained files and records relating to the Promoter #1 campaign on the employee's computer hard drive.

On or about August 18, 2004, Promoter #1 contacted O'Grady to persuade O'Grady to have TBC distribute additional stock promotion messages.  Promoter #1 informed O'Grady that if the additional messages were not distributed, Promoter #1 would not get paid and TBC would not get paid.  O'Grady agreed to have TBC distribute additional messages for Promoter #1.  When O'Grady told a TBC engineer to distribute additional voicemail messages for the campaign, the TBC engineer informed O'Grady that all pre-recorded messages and call data relating to the Promoter #1 campaign had been deleted.  O'Grady contacted Promoter #1, who said he would drop new messages on the TBC system.  Thereafter, on or about August 18, 2004, additional messages touting the stock of AMUT and TWTN were dropped onto the TBC system.  The TBC system distributed voicemail messages similar to those described above but touting the stocks to AMUT and TWTN to thousands of telephone subscribers throughout the United States.

The voicemail campaign touting the common stock of DNNI, FGWC, IVFH, MAUG, and PWRM resulted in material increases in the price and volume of each of these stocks.

On or about August 19, 2004, Promoter #1 contacted O'Grady by telephone and insisted that O'Grady have TBC distribute additional messages.  O'Grady refused.  Promoter #1 asked O'Grady to delete everything related to Promoter #1, including messages relating to the stock promotion campaign and campaigns for Company A, off TBC's system.  O'Grady instructed a

TBC engineer to delete everything off TBC's system relating to the Promoter #1 campaign including the messages, the Promoter #1 campaign file and call data information. O'Grady intended for the TBC employee to delete all records and files relating to the Promoter #1 campaign off the TBC computer system to corruptly obstruct and impede any Securities and Exchange Commission investigation or any other law enforcement investigation relating to the aforementioned "covert" telemarketing stock promotion campaign. Pursuant to O'Grady's instructions, voicemail messages, files and call data were deleted off the TBC computer systems. However, unbeknownst to O'Grady, Promoter #1 and others, at least one TBC employee maintained files and records relating to the Promoter #1 campaign on the employee's computer hard drive.

On or about August 19, 2004, the United States Securities and Exchange Commission issued an investor alert and press release designed to warn Americans about a new stock manipulation scam sweeping the country: answering machine wrong number stock touts. The SEC investor alert described the voicemails being sent to investors disguised as misdirected voicemails.

On or about August 19, 2004, O'Grady asked a TBC engineer whether it would be possible to trace the voicemails to TBC. The TBC engineer informed O'Grady that it would be easy to trace the calls to TBC. O'Grady later informed Promoter #1 that it would be easy to trace the voicemails to TBC. Promoter #1 responded with an expletive.

O'Grady received approximately $1,750 in cash from another person who traded in certain of the aforementioned securities.

13

## V.    Cash Payment by Promoter #1 and Promoter #2 to O'Grady

On or about August 30, 2004, Promoter #1 informed O'Grady that he was meeting his customer in Gulfport, MS to receive payment for the stock promotion campaign because his customer was driving from Houston, Texas. O'Grady offered to fly Promoter #1 to Gulfport, Mississippi. On August 31, 2004, O'Grady flew in a private plane to Sanford, Florida to pick up Promoter #1  When O'Grady arrived in Sanford, Florida, he met Promoter #1 and Promoter #2 at the airport. Promoter #1 explained to O'Grady that the customer they were meeting was really Promoter #2's customer, and that Promoter #2 would pick up the money and pay Promoter #1

O'Grady, Promoter #1 and Promoter #2 flew in the plane to Gulfport, Mississippi, and went to a casino. Promoter #1 and O'Grady thereafter began playing blackjack. Promoter #2 left Promoter #1 and O'Grady empty handed and returned ten minutes later with a blue duffle bag with the word "Grand" on it. After Promoter #2 gave the bag to Promoter #1, Promoter #1 pulled $10,000 cash out of the bag and gave it to O'Grady. Promoter #1 gambled heavily and dipped into the bag at various times to obtain additional cash with which to gamble. Around 2:00 a.m. Promoter #1 gave O'Grady several thousand dollars worth of chips and left with the blue bag to retire for the evening. The next morning O'Grady met Promoter #1 at the hotel room Promoter #1 and Promoter #2 shared. Cash was spread out on the bed and was in the open hotel safe. Promoter #1 gave O'Grady some additional cash.

## VI.    The Investigation by the United States Securities and Exchange Commission

In or about July and August 2004, the United States Securities and Exchange Commission ("SEC") was investigating whether, in connection with the voicemail stock promotion campaign described above, persons or entities had violated the laws of the United

14

States, including by committing securities fraud in violation of Title 15, United States Code,

Sections 78j(b) and 78ff, in connection with the purchase and sale of the common stock of

AMUT, DNNI, FGWC, IVFH, MAUG, PWRM, and TWTN.

    As the investigation progressed, the documents and records stored on TBC's computers

such as e-mails, pre-recorded messages, call data and other records were material to the SEC's

investigation and were among the records the SEC ultimately subpoenaed TBC to produce.

Many of the records the SEC required TBC to produce pursuant to a validly issued subpoena

were those that O'Grady had instructed a TBC engineer to delete.

                            Respectfully submitted,

                            KENNETH L. WAINSTEIN
                            United States Attorney
                            for the District of Columbia
                            D.C. Bar No. 451058

By:                           
                            JONATHAN R. BARR
                            Assistant United States Attorney
                            D.C. Bar No. 437334
                            555 4th Street, N.W., Room 5241
                            Washington, DC  20530
                            Phone: (202) 514-9620
                            Fax:    (202) 307-2304

    I have read every word of this Statement of Offense.  Pursuant to Fed. R. Crim. P. 11 and
28 U.S.C. § 1746, after consulting with my attorney, Bruce Bettigole, I agree and stipulate to this
Statement of Offense, and admit and declare under penalties of perjury that the facts recited
within this Statement of Offense are true and correct.

Date: 5/3/05

                                Michael O'Grady
                                  Defendant

15

I have discussed this Statement of Offense with my client, Michael O'Grady. I concur with his decision to stipulate to this Statement of Offense.

Date: _May 5, 2005_          _____

                                        Bruce Bettigole, Esquire
                                        Attorney for the Defendant

16